GAYANE KHECHOOMIAN (SBN 296673)
gayane.khechoomian@gmail.com
201 N. Brand Blvd., Suite 200
Glendale, California 92203-3590
Telephone: (818) 454-0446

KARNIG KERKONIAN (pro hac vice)
kkerkonian@kerkoniandajani.com
ELIZABETH AL-DAJANI (pro hac vice)
ealdajani@kerkoniandajani.com
KERKONIAN DAJANI LLC
1555 Sherman Avenue, Suite 344
Evanston, Illinois 60201
Telephone: (312) 416-6180
Facsimile: (312) 604-7815

GARO B. GHAZARIAN (SBN 152790)
gbglaw@sbcglobal.net
LAW OFFICE OF GARO B. GHAZARIAN
15915 Ventura Blvd., Suite 203
Encino, California 91436
Telephone: (818) 905-6484

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| A-WORLD TRADE, INC.,<br>Plaintiff,<br><br>v.<br><br>APMEX, INC., BAY PRECIOUS METALS, INC., BULLION EXCHANGE, LLC, BULLION SHARK, LLC, DBS COINS LP, JM BULLION, INC., LIBERTY COIN, LLC, MODERNCOINMART, LLC, PINEHURST COIN EXCHANGE, | CASE NO. 2:20-CV-1032<br><br>**SECOND AMENDED COMPLAINT** |

INC., SCOTTSDALE MINT, LLLP,
SD BULLION, INC., SILVER GOLD
BULL USA, INC., SILVER TOWNE,
INC. AND TEXAS GOLD AND
SILVER EXCHANGE, LTD.,

Defendants.

Plaintiff A-WORLD TRADE, INC., by and through its undersigned counsel, files this Second Amended Complaint against Defendants APMEX, INC.; BAY PRECIOUS METALS, INC.; BULLION EXCHANGE, LLC; BULLION SHARK, LLC; DBS COINS LP; JM BULLION, INC.; LIBERTY COIN, LLC; MODERNCOINMART, LLC; PINEHURST COIN EXCHANGE, INC.; SCOTTSDALE MINT, LLLP; SD BULLION, INC.; SILVER GOLD BULL USA, INC.; SILVER TOWNE, INC.; and TEXAS GOLD AND SILVER EXCHANGE, LTD. (collectively, "Defendants"), and alleges as follows:

## I.    NATURE OF THE CASE

1.    This case arises out of an unlawful, pricing-fixing scheme by and among each of the named Defendants *inter alia* to foreclose competition in the sale of gold bullion in the online gold bullion market on the eBay platform.  Defendants have priced and sold, and have coordinated their pricing and selling of, such gold commodities at below-cost prices.   In doing so, Defendants did not intend to generate actual profits but, instead, intended to injure competitors and foreclose competition in the gold bullion market on eBay.

2.     Defendants sought to mask their conduct from competitors, like Plaintiff, *inter alia*, by alternating in the sale of such gold commodities at below-cost prices and by working through an intermediary in order to facilitate and coordinate their enterprise and to make discovery of their coordinated conduct difficult.  Defendants' conduct and coordinated scheme have allowed them to hold market power in the eBay online gold bullion market and foreclose approximately 95% competition in such market.  Their conduct and scheme has also damaged Plaintiff, like other competitors, by effectively preventing such competitors from selling gold bullion in the eBay online gold bullion market.  As such, Defendants have effectively and unlawfully eliminated competition in the gold bullion market, and they have unlawfully secured for themselves an unfair advantage and benefit, to the detriment of competition and competitors like Plaintiff.

3.     Plaintiff brings six causes of action. Plaintiff alleges an antitrust violation against Defendant Apmex Inc. under Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. 13(a) (Count 1).  Plaintiff also alleges violations against all Defendants under the Sherman Antitrust Act, 15 U.S.C. § 1 (Count 2).  Finally, Plaintiff alleges statutory state claims against each Defendant under California Business & Professions Code Section 17043 (Counts 3 and 4) and Section 17044 (Counts 5 and 6).

## II.     PARTIES

4.     Plaintiff is a California corporation with its principal place of business in La Crescenta, California.

5.      Defendant Apmex, Inc. is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma.

6.      Defendant Bay Precious Metals, Inc. is a Massachusetts corporation with its principal place of business in Bridgewater, Massachusetts.

7.      Defendant Bullion Exchange LLC is a Delaware limited liability company with its principal place of business in New York, New York.

8.      Defendant Bullion Shark LLC is a New York limited liability company with its principal place of business in Old Westbury, New York.

9.      Defendant DBS Coins LP is a California limited partnership with its principal place of business in Monarch Beach, California.

10.     Defendant JM Bullion, Inc. is a Delaware corporation with its principal place of business in Dallas, Texas.

11.     Defendant Liberty Coin, LLC is a California limited liability company with its principal place of business in Signal Hill, California.

12.     Defendant Moderncoinmart LLC is a Delaware limited liability company with its prior principal place of business in Sarasota, Florida, and an unknown location as its current principal place of business.

13.     Defendant Pinehurst Coin Exchange, Inc. is a North Carolina corporation with its principal place of business in Pinehurst, North Carolina.

14.     Defendant Scottsdale Mint, LLLP is a Delaware limited liability limited partnership with its principal place of business in Scottsdale, Arizona.

15.     Defendant SD Bullion, Inc. is an Ohio corporation with its principal place of business in Toledo, Ohio.

16.     Defendant Silver Gold Bull USA, Inc. is a Delaware corporation with its principal place of business in Las Vegas, Nevada.

17.     Defendant Silver Towne, Inc. is an Indiana corporation with its principal place of business in Winchester, Indiana.

18.     Defendant Texas Gold and Silver Exchange, Ltd. is a Texas company with its principal place of business in Austin, Texas.

### III.     JURISDICTION AND VENUE

19.     This Court has original jurisdiction in this matter as it involves a federal question under Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a) and under the Sherman Antitrust Act, 15 U.S.C. § 1.

20.     As to Counts 3 and 5, this Court also has jurisdiction based on diversity, in that the parties to Counts 3 and 5 are citizens of different states and the amount in controversy as to Counts 3 and 5 exceeds the sum of $75,000. 28 U.S.C. § 1332(a)(1).

21.     This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 29 U.S.C. § 1367 because they are so related to Plaintiff's claim within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

22.     Venue is also proper in this district under 15 U.S.C §§ 15, 22, as one or more of the Defendants transact business in this federal district.

### IV.     FACTS

#### A.     Background

SECOND AMENDED COMPLAINT

23.   This case involves the sale of gold bullion, which includes such products as gold coins and gold bars as listed in Exhibit 1 attached hereto (hereinafter, "Gold Bullion Commodities" or "GBCs").

24.   Plaintiff is a seller of GBCs in the eBay gold bullion market ("eBay GB Market").

25.   GBCs are commodities. *See* Exhibit 2 at 2-3; *see* Exhibit 3, generally.

26.   Plaintiff has been selling GBCs in the eBay GB Market since 2006.

27.   Plaintiff has sold and attempted to sell GBCs in the eBay GB Market during the four-year time period from January 31, 2016 to January 31, 2020 (the "Time Period").

28.   Plaintiff and Defendants are sellers of one or more of the GBCs identified in Exhibit 1 in the eBay GB Market.

B.   Costs

29.   When selling GBCs in the eBay GB Market, a seller incurs certain costs.

30.   These seller costs include (a) the purchase cost of the GBCs; (b) the eBay transaction fees; (c) shipping costs of the GBCs; (d) payment processing fees; and (e) certain additional costs.

31.   The first component of cost is the seller's own *purchase cost* of GBCs. Since Defendants' specific purchase cost information for GBCs sold by each Defendant during the Time Period is not available to Plaintiff, and available only to Defendants and eBay, Plaintiff uses the "spot" price of gold as a reliable marker for purchase cost.

32.     Since a GBC is a fungible market commodity, its historic prices fluctuate with the change in the market "spot" price of the underlying precious metal, gold, and by the supply and demand for GBCs. *See* Exhibit 4, 26.   eBay explains the relationship between spot and purchase price directly on its website: "[t]he price you'll pay for precious metals will be the spot price plus a small premium." *See* Exhibit 5.

33.     Defendant Apmex, Inc. itself has identified the relationship between the spot price of gold and the price of GBCs: "The market for Physical Gold, such as that in the form of bullion items available for purchase at APMEX, *tracks the Gold spot price religiously,* and GBC product prices tend to hover just over the spot price of Gold." *See* Exhibit 6 (emphasis added).  Of course, these "spot" prices are transparent, discoverable and tracked by numerous market resources and, as such, provide reliable markers as to the purchase cost of a GBC on a particular date. *See* Exhibit 26.

34.     In addition, spot price is a reliable proxy for the purchase price of the GBCs sold because of the *manner* in which Defendants buy GBCs in bulk when preparing to sell such GBCs at the below-Cost price in the eBay GB Market. Exhibit 6.  A Defendant would first determine which GBC it will be selling at what below-Cost price and at what quantity. Then, Defendant would contact its supplier and "lock the price" or "put a hold on the product" of a particular quantity of such GBC. Once the Defendant has placed this "hold" or "lock" on a price with its supplier, such Defendant would then sign off on the confirmation of its commitment to sell a fixed amount of such GBCs at a certain below-Cost price for a fixed time period (*see infra* III(D)).  Of course, the price at which the supplier would sell the

GBCs to Defendant would be at least some margin over spot price. *See* Exhibit 5. Accordingly, the spot price of the GBC is a reliable marker of the purchase cost, in fact a conservative one, representing the lowest price at which a Defendant would acquire the GBCs in bulk prior to selling them on the eBay GB Market at below-Cost prices.

35.   The second component of the seller's cost, when selling a GBC in the eBay GB Market, is the *eBay transaction fee*.   eBay categorizes sellers on its platform by certain tiers.  It charges sellers a certain eBay transaction fee, in an amount corresponding to such seller's eBay tier, when that seller makes a sale of a GBC on the eBay platform.  The highest seller tier on eBay, which is Plaintiff's tier, enjoys the lowest eBay transaction fee—which is 6.15% of the total sale price. *See* Exhibit 8.  eBay has informed Plaintiff that there are no other seller tiers on the eBay platform enjoying lower eBay transaction fees than the seller tier afforded Plaintiff.  In addition, eBay charges a listing fee of $.10 to $.25 per item.

36.   The third component of a seller's cost, when selling a GBC on the eBay platform, is the *shipping cost*.  The cost of shipping a GBC is approximately 0.5% of the sale price.  This shipping fee may be calculated on the platform's own shipping cost estimator. *See* Exhibit 9.

37.   The fourth component of a seller's cost, when selling GBCs on the eBay GB Market, is the *payment processing cost*.  The eBay GB Market requires the use of Paypal to process sales on sales made on the platform.  The cost of Paypal payment processing on the eBay platform for the sale of GBCs is approximately 2.9% of the total sale price. Exhibit 11 at 2; *see* Exhibit 10.

38.     The final component of a seller's cost are *overhead costs*, such as *inter alia* labor (including salaries of executives and officers), rent, interest on borrowed capital, depreciation, selling cost, maintenance of equipment, delivery costs, credit losses, all types of licenses, taxes, insurance and advertising. Cal. Bus. & Prof. Code § 17029 (West).

39.     The costs listed in Paragraphs 30 through 38 are, together, referred to herein as the "Cost" of selling a GBC in the eBay Market.

40.     During the Time Period, each Defendant sold GBCs at prices below its Cost.  For example, in June and July 2019 alone:[1]

   a. Defendant Apmex, Inc., on or about July 15, 2019, sold 600 gold coins (1oz. Canadian Maple Leafs) at a price of $1425 each.  Defendant's Cost in each gold coin was approximately: (i) $1412.40 in purchase cost; (ii) $85.50 in eBay transaction fees; (iii) $7.13 in shipping fees; and (iv) $41.33 in payment processing fees.  Accordingly, and without even taking into consideration overhead costs, Defendant Apmex, Inc. sold such gold coins on such date at $121.35 below its Cost per gold coin.

   b. Defendant Apmex, Inc., on or about July 25, 2019, sold 600 gold bars (1oz. Valcambi) at a price of $1434 each.  Defendant's Cost in each

---

[1] The examples contained in paragraph 40 are a snapshot of a portion of the below-Cost pricing during a 60-day period in June and July 2019. It is not a comprehensive or exhaustive list of all of the Defendants' below-Cost sales either during this two-month period or over the entire Time Period.

gold bar was approximately: (i) $1416.10 in purchase cost; (ii) $86.04 in eBay transaction fees; (iii) $7.17 in shipping fees; and (iv) $41.59 in payment processing fees.  Accordingly, and without even taking into consideration overhead costs, Defendant Apmex, Inc. sold such gold bars on such date at $116.90 below its Cost per gold bar.

c.   Defendant Bay Precious Metals, Inc., on or about July 25, 2019, sold 265 gold coins (1oz. American Eagles) at a price of $1422-1437 each. Even at the highest price, Defendant's Cost in each gold coin was approximately: (i) $1416.10 in purchase cost; (ii) $86.22 in eBay transaction fees; (iii) $7.19 in shipping fees; and (iv) $41.67 in payment processing fees.  Accordingly, and without even taking into consideration overhead costs, Defendant Bar Precious Metals, Inc. sold such gold coins on such date at $114.18 below its Cost per gold coin.

d.   Defendant Bullion Exchange, Inc., on or about July 2, 2019, sold 400 gold bars (1oz. Pamp Lady Fortuna) at a price of $1411 each. Defendant's Cost in each gold bar was approximately: (i) $1391.05 in purchase cost; (ii) $84.66 in eBay transaction fees; (iii) $7.06 in shipping fees; and (iv) $40.92 in payment processing fees. Accordingly, and without even taking into consideration overhead costs, Defendant Bullion Exchange, Inc. sold such gold bars on such date at $112.68 below its Cost per gold bar.

e.   Defendant Bullion Exchange, Inc., on or about June 5, 2019, sold 880 gold coins (1oz. South African Krugerrands) at a price of $1346 each. Defendant's Cost in each gold coin was approximately: (i) $1335.05 in

SECOND AMENDED COMPLAINT

purchase cost; (ii) $80.76 in eBay transaction fees; (iii) $6.73 in shipping fees; and (iv) $39.03 in payment processing fees. Accordingly, and without even taking into consideration overhead costs, Defendant Bullion Exchange, Inc. sold such gold coins on such date at $115.57 below its Cost per gold coin.

f.  Defendant DBS Coins, LP, on or about July 9, 2019, sold 250 gold bars (1oz. Royal Canadian Mint) at a price of $1412 each. Defendant's Cost in each gold bar was approximately: (i) $1391.55 in purchase cost; (ii) $84.72 in eBay transaction fees; (iii) $7.06 in shipping fees; and (iv) $40.95 in payment processing fees. Accordingly, and without even taking into consideration overhead costs, DBS Coins, LP sold such gold bars on such date at $112.28 below its Cost per gold bar.

g.  Defendant DBS Coins, LP, on or about June 13, 2019, sold 255 gold coins (1oz. Canadian Maple Leafs) at a price of $1353 each. Defendant's Cost in each gold coin was approximately: (i) $1335.90 in purchase cost; (ii) $81.18 in eBay transaction fees; (iii) $6.77 in shipping fees; and (iv) $39.24 in payment processing fees. Accordingly, and without even taking into consideration overhead costs, DBS Coins, LP sold such gold coins on such date at $110.08 below its Cost per gold coin.

h.  Defendant JM Bullion, Inc., on or about July 19, 2019, sold 400 gold bars (1oz. Valcambi) at a price of $1440 each. Defendant's Cost in each gold bar was approximately: (i) $1439.70 in purchase cost; (ii) $86.40 in eBay transaction fees; (iii) $7.20 in shipping fees; and (iv)

$41.76 in payment processing fees.  Accordingly, and without even taking into consideration overhead costs, JM Bullion, Inc. sold such gold bars on such date at $135.06 below its Cost per gold bar.

i.  Defendant JM Bullion, Inc., on or about July 11, 2019, sold 700 gold coins (1oz. Canadian Maple Leafs) at a price of $1421 each. Defendant's Cost in each gold coin was approximately: (i) $1413.75 in purchase cost; (ii) $85.26 in eBay transaction fees; (iii) $7.11 in shipping fees; and (iv) $41.21 in payment processing fees. Accordingly, and without even taking into consideration overhead costs, JM Bullion, Inc. sold such gold coins on such date at $126.32 below its Cost per gold coin.

j.  Defendant Liberty Coins, LLC, on or about June 19, 2019, sold 1000 gold bars (1oz. Perth Mint) at a price of $1353-1362 each.  Even at the highest price, Defendant's Cost in each gold bar was approximately: (i) $1344.05 in purchase cost; (ii) $81.72 in eBay transaction fees; (iii) $6.81 in shipping fees; and (iv) $39.50 in payment processing fees. Accordingly, and without even taking into consideration overhead costs, Liberty Coins, LLC sold such gold bars on such date at $110.08 below its Cost per gold bar.

k.  Defendant Liberty Coins, LLC, on or about July 10, 2019, sold 500 gold coins (1oz. American Eagles) at a price of $1417 each. Defendant's Cost in each gold coin was approximately: (i) $1408.30 in purchase cost; (ii) $85.02 in eBay transaction fees; (iii) $7.09 in shipping fees; and (iv) $41.09 in payment processing fees.

Accordingly, and without even taking into consideration overhead costs, Liberty Coins, LLC sold such gold coins on such date at $124.50 below its Cost per gold coin.

l.  Defendant Moderncoinmart, LLC, on or about July 29, 2019, sold 500 gold coins (1oz. Canadian Maple Leafs) at a price of $1430 each. Defendant's Cost in each gold coin was approximately: (i) $1419.05 in purchase cost; (ii)85.80in eBay transaction fees; (iii) $7.15 in shipping fees; and (iv) $41.47 in payment processing fees.  Accordingly, and without even taking into consideration overhead costs, Moderncoinmart, LLC sold such gold coins on such date at $123.47 below its Cost per gold coin.

m. Defendant Pinehurst Coin Exchange, Inc., on or about July 22, 2019, sold 300 gold bars (1oz. Royal Canadian Mint) at a price of $1444 each.  Defendant's Cost in each gold bar was approximately: (i) $1427.75 in purchase cost; (ii) $86.64 in eBay transaction fees; (iii) $7.22 in shipping fees; and (iv) $41.88 in payment processing fees. Accordingly, and without even taking into consideration overhead costs, Pinehurst Coin Exchange, Inc. sold such gold bars on such date at $119.49 below its Cost per gold bar.

n.  Defendant Pinehurst Coin Exchange, Inc., on or about June 21, 2019, sold 600 gold coins (1oz. Canadian Maple Leafs) at a price of $1420 each.  Defendant's Cost in each gold coin was approximately: (i) $1397.15 in purchase cost; (ii) $85.20 in eBay transaction fees; (iii) $7.10 in shipping fees; and (iv) $41.18 in payment processing fees.

Accordingly, and without even taking into consideration overhead costs, Pinehurst Coin Exchange, Inc. sold such gold coins on such date at $110.63 below its Cost per gold coin.

o. Defendant Scottsdale Mint, LLLP, on or about July 12, 2019, sold 113 gold bars (1oz. Scottsdale) at a price of $1428 each. Defendant's Cost in each gold bar was approximately: (i) $1407.60 in purchase cost; (ii) $85.68 in eBay transaction fees; (iii) $7.14 in shipping fees; and (iv) $41.41 in payment processing fees. Accordingly, and without even taking into consideration overhead costs, Scottsdale Mint, LLLP sold such gold bars on such date at $113.83 below its Cost per gold bar.

p. Defendant SD Bullion, Inc., on or about July 30, 2019, sold 100 gold bars (1oz. Pamp Lady Fortuna) at a price of $1446 each. Defendant's Cost in each gold bar was approximately: (i) $1425.90 in purchase cost; (ii) $86.76 in eBay transaction fees; (iii) $7.23 in shipping fees; and (iv) $41.93 in payment processing fees. Accordingly, and without even taking into consideration overhead costs, SD Bullion, Inc. sold such gold bars on such date at $115.82 below its Cost per gold bars.

q. Defendant SD Bullion, Inc., on or about July 24, 2019, sold 500 gold coins (1oz. Canadian Maple Leafs) at a price of $1437 each. Defendant's Cost in each gold coin was approximately: (i) $1426.95 in purchase cost; (ii) $86.22 in eBay transaction fees; (iii) $7.19 in shipping fees; and (iv) $41.67 in payment processing fees. Accordingly, and without even taking into consideration overhead

SECOND AMENDED COMPLAINT

costs, SD Bullion, Inc. sold such gold coins on such date at $125.03 below its Cost per gold coin.

r.   Defendant Silver Gold Bull USA, Inc., on or about June 14, 2019, sold 500 gold coins (1oz. Canadian Maple Leafs) at a price of $1351-1365 each.  Even at the highest price, Defendant's Cost in each gold coin was approximately: (i) $1351.25 in purchase cost; (ii) $81.90 in eBay transaction fees; (iii) $6.83 in shipping fees; and (iv) $39.59 in payment processing fees.  Accordingly, and without even taking into consideration overhead costs, Silver Gold Bull USA, Inc. sold such gold coins on such date at $114.56 below its Cost per gold coin.

s.   Defendant Texas Gold and Silver Exchange, Ltd., on or about June 23, 2019, sold 100 gold bars (1oz. Perth Mint) at a price of $1414 each. Defendant's Cost in each gold bar was approximately: (i) $1397.15 in purchase cost; (ii) $84.84 in eBay transaction fees; (iii) $7.07 in shipping fees; and (iv) $41.01 in payment processing fees. Accordingly, and without even taking into consideration overhead costs, Texas Gold and Silver Exchange, Ltd. sold such gold bars on such date at $ 116.07 below its Cost per gold bar.

t.   Defendant Texas Gold and Silver Exchange, Ltd., on or about June 3, 2019, sold 36 gold coins (1oz. American Eagles) at a price of $1337 each.   Defendant's Cost in each gold coin was approximately: (i) $1317.10 in purchase cost; (ii) $80.22 in eBay transaction fees; (iii) $6.69 in shipping fees; and (iv) $38.77 in payment processing fees. Accordingly,  and  without  even  taking  into  consideration  overhead

costs, Texas Gold and Silver Exchange, Ltd. sold such gold coins on such date at $105.78 below its Cost per gold coin.

### C.     Relevant Market

41.     Defendants, through their unlawful and anticompetitive acts described below, have been and are able to foreclose competition and possess market power in the eBay GB Market.

42.     The relevant geographic market and area of effective competition for the sale of GBCs in the eBay GB Market is the United States.

43.     Plaintiff and Defendants are competitors in the sale of GBCs in the eBay GB Market.

44.     The eBay GB Market is an online bullion market for GBCs hosted by eBay, Inc. and located at the following url: https://www.ebay.com/b/Gold-Bullion/45134/bn_1642102.

45.     The GBCs sold in the eBay GB Market share the following common characteristics: (a) they are made of gold; (b) they store a value related directly to the price of gold; and (c) they are acquired primarily for the purpose of investment. *See* Exhibit 2 at 2; Exhibits 5-6.

46.     GBCs, moreover, are also distinct from other types of precious-metal commodities such as silver bullion or platinum bullion.  As eBay/Apmex itself states: "The price of Gold tends to be less volatile than other assets[]" and, "[g]enerally, during times of inflation, the relative purchasing power of Gold has typically been stable or has increased." Exhibit 2 at 4.  According to Defendant Apmex, Inc., "Gold is the fourth asset class, along with stocks, bonds and cash." *Id.* at 3; Exhibit 23 at 1.  In fact, as Defendant Apmex, Inc. makes clear, "Gold is

virtually indestructible and . . . [u]nlike base metals and other Precious Metals, it does not require industrial production." *Id.* at 4.  Finally, there is price stability based on gold's unique mining characteristic: "Gold is produced from mines on every continent except Antarctica . . . . The geographic diversity adds stability to Gold's Price." *Id.*

47.   GBCs in the eBay GB Market include, but are not limited to, the products identified in Exhibit 1 hereto.  Such GBCs are, based on weight, reasonable economic substitutes for consumers and enjoy a reasonable interchangeability of use and cross-elasticity of demand within the eBay GB Market.

48.   Importantly, the eBay GB Market is materially distinct and distinguishable from the market for gold bullion generally, whether online or otherwise.  The eBay GB Market does not include other online stores or brick-and-mortar stores because other online stores or brick-and-mortar stores are not reasonable alternatives for consumers of gold bullion.  There are a number of reasons for this.

49.   First, both eBay and Defendant Apmex, Inc. have made statements to that effect.  Defendant Apmex, Inc.'s Executive Vice President, Paul Montgomery, stated in 2012: "We've created this team-up that brings the marketplace of eBay, which is extraordinary, and then the product offering and the technology that we bring to eBay that really doesn't exist in our industry, yet."[2]   Vice President

---

[2] Coinweek, APMEX and eBay Announce Precious Metals Trading. VIDEO: 3:27 (Oct. 23, 2012),  https://www.youtube.com/watch?v=8_ps0ib2fHY.

Montgomery stated further: "we think that the eBay customer is different than the customer we see in our typical marketplace. And because of that we believe that it is a completely untapped market." *Id*.   He was also quoted in that same year describing the eBay GB Market as a "completely different marketplace for us." Exhibit 31.   eBay, in turn, has stated that it is going to "use the marketing around the Apmex and the Apmex Bullion center on eBay as a way to increase buyer awareness of eBay as a bullion destination and by extension a collectible coin destination."[3]

50.    Second, the eBay GB Market is separate and distinct from other online markets for gold bullion because it permits additional selling formats, functioning contemporaneously, and not simply a fixed-price format.   For example, these markets include "auctions" by sellers.   In the auction selling format, a seller lists an item for a set amount of time and buyers must place a bid to purchase.   Buyers must place a bid higher than the last bid placed.   At the end of the auction the buyer with the highest bid "wins" that item and the seller is obligated then to sell the item to that "winning" buyer. *See* Exhibit 14.

51.    The eBay GB Market also allows a "Buy It Now" purchasing format, allowing a buyer to purchase an item immediately at a set price without waiting for a listing to end. *See* Exhibit 14.   There are two types of eBay listings that may have a "Buy It Now" price: (a) items that have a bid price and a "Buy It Now" price, for which a buyer can place a bid or purchase the item immediately and (b) items that

---

[3] Coinweek, APMEX and eBay Announce Precious Metals Trading. VIDEO: 3:27 (Oct. 23, 2012),  https://www.youtube.com/watch?v=8_ps0ib2fHY.

have a "Buy It Now" price only (no bidding), which a buyer can purchase immediately. *See* Exhibit 14.

52.     Third, the eBay GB Market affords sellers and buyers certain services and protections, the combination of which are not available on other market platforms.   For instance, the eBay GB Market contains confidence-building measures *vis-a-vis* seller protections, verified buyers, buyer rankings, a consistent timeline for purchase and delivery, payment securitization, rankings of buyers, and overall transaction certainty. *See* Exhibit 18 at 4; *see* Exhibits 32-36.

53.     Moreover, the buyer protections afforded by eBay are crucial to ensuring trust and confidence in the online purchase and sale of GBCs in the eBay GB Market.   eBay provides such buyer protection, as declared on its website: "[i]f for some reason you don't receive your item, or it isn't as described in the listing, your bullion purchase price plus original shipping will automatically be covered by eBay Buyer Protection."   eBay "covers your purchase price plus original shipping on virtually all items." *See* Exhibit 16.   The eBay GB Market insures over the transaction outright.

54.     This is part of the eBay GB Market's broader approach to combat "bad activity", including counterfeits, which is a serious concern for consumers in online or even brick-and-mortar stores. *See* Exhibit 17; *see* Exhibit 18.   eBay has "developed a trust infrastructure that allows [it] to underwrite the vast majority of transactions on [its] platform—a guarantee of roughly $55 *billion* in annual purchases". Exhibit 18 at 3; *see* Exhibit 29; *see* Exhibits 29-30.   Incorporated in this approach is also eBay's policy against sellers asking buyers to complete transactions off of eBay. *See* Exhibit 5 at 4.

55.     Taken together, the consumer need not have *any* expertise whatsoever in purchasing a GBC on the eBay GB Market: the purchase is automatically underwritten by the eBay GB Market, insured by eBay's buyer protection, and it is secured by eBay's trust infrastructure to insure that the product actually being purchased is not a counterfeit.

56.     Sellers benefit from eBay's ongoing commitment to "provide a marketplace that allows them to thrive in this new world of commerce – so they can sell with confidence, knowing that eBay has the people, policies and processes in place to help keep our sellers protected." *See* Exhibit 18.  To this end, eBay also employs a unique Verified Rights Owner Program, which eBay's user agreement describes as "ensur[ing] that listed items and content on our site or in our apps do not infringe upon the copyright, trademark, or certain other intellectual property rights of third parties." Exhibit 19 at 11-12; *see* Exhibit 20.

57.     As an added benefit to both buyers and sellers in the eBay GB Market, eBay's website states that it has a "wide selection of bullion at highly competitive prices, and there aren't any hidden fees to watch out for. You won't be charged extra for paying with a credit card, and you'll see shipping costs right from the beginning." *See* Exhibit 5 at 4.  This, in addition to a fast delivery promise, shipping within 3 days and transparent pricing, is explained on its website: "[t]he price you'll pay for precious metals will be the spot price plus a small premium." *See* Exhibit 5 at 1.

58.     Moreover, Defendants compete with other sellers on eBay in the eBay GB Market separately from their own websites (or other websites outside of the

eBay GB Market) on which they sell GBCs of like grade and quality, but at a different price than they sell such items in the eBay GB Market. *See* Exhibits 27-28.

59.     Finally, and importantly, buyers can accumulate and use "eBay Bucks" for purchases in the eBay GB Market. *See* Exhibit 21.  Such eBay Bucks are non-transferrable and earned from prior qualifying purchases on eBay. *Id*.  eBay Bucks accrue each calendar quarter and can be redeemed for purchases only on the eBay platform, including the eBay GB Market.  eBay Bucks that are not redeemed within the specified time period expire. *Id*.

### D.     The Defendants' Agreement

60.     During the Time Period, Defendants were engaged in interstate commerce, in the United States and across state lines, involving the sale of GBCs in the eBay GB Market.

61.     Defendants agreed to coordinate and sequence pricing GBCs at prices below their Cost, at fixed quantities, and for predetermined periods of time in order to foreclose competition in the eBay GB Market.  Defendants agreed among each other to coordinate below-Cost pricing, and they made their conscious commitment and coordinated their conduct with one another through an intermediary, eBay.

### *Defendants' Agreement and the Confirmations*

62.     Defendants coordinated their pricing in the following manner: they specifically communicated information with one another regarding decisions as to below-Cost pricing, quantities, product, sequencing and time periods through the intermediary using phone calls, digital correspondence (including but not limited to messaging on the eBay communications platform) and/or by written confirmations in a form substantially similar to the one attached hereto as Exhibit 22

("Confirmation"), as further described below.   During the Time Period, each Defendant had entered into one or more Confirmations involving the sale of GBCs in the eBay GB Market at a below-Cost price.

63.    Each Confirmation included the material terms of such Defendant's commitment to the other Defendants through the intermediary as to which GBC it would offer at the below-Cost price, the actual below-Cost price, the quantity such Defendant would sell at the below-Cost price and how long such Defendant would continue to offer such GBC at such below-Cost price.   There was neither coincidental interdependence nor independent action.

64.    As demonstrated below in the figure, these material terms—(i) discounted price, (ii) quantity, (iii) time period, and (iv) product which such undersigned Defendant is to sell—are expressly noted in the Confirmation:



*Figure 1*

*See* Exhibit 22 at 8 (Figure 1).  The terms are also reflected in the Deal Order Form:



*Figure 2*

*See* Exhibit 22 at 12 (Figure 2).

65.    Each Defendant arrived at these terms in consultation with the other Defendants or in consultation with the intermediary who, in turn, communicated with the other Defendants as to the same.  Defendants communicated with one another in this manner, through the intermediary, regarding the pricing scheme, the below-Cost pricing and the amount of time Defendant would offer such GBCs at such below-Cost pricing with full knowledge that eBay, in turn, would communicate, and was communicating, with the other Defendants as to the same. Each named Defendant communicated and corresponded with other Defendant(s) through the intermediary in this manner to determine when to price a particular GBC at which particular below-Cost price and for how long in the eBay GB Market.

66.    In some cases, a given Defendant would share its suggested below-Cost price, its suggested quantities and its suggested time period for selling a GBC in the eBay GB Market at the below-Cost price with the intermediary who would convey such information to other Defendant(s).   In others, the intermediary may have already secured details from other Defendant(s) as to a particular GBC, a below-Cost price and a quantity at the time of speaking with the listing Defendant and, in such circumstances, would convey such information to the given Defendant. In each case, such Defendant would not start its below-Cost pricing of the GBC until the Confirmation was finalized.

67.    During its discussions with the intermediary, such Defendant would contact its supplier to put a "hold" or a "freeze" on a purchase price for the predetermined quantity of the particular GBC, the intermediary would share the confirmed information with one or more other Defendants in furtherance of their agreement as alleged herein.   This step necessarily removed any independent decision-making on the part of each Defendant.   The Defendant having secured its price from its supplier, and the intermediary having informed the other Defendant(s) in furtherance of the agreement, the listing Defendant and the intermediary would execute the Confirmation as agreed by the "selected sellers".

*Concerted Coordination*

68.    Importantly, and while the Confirmation was entered into by each Defendant and the intermediary, *on its face*, each Defendant knew that it was not acting alone or unilaterally and that, in fact, it was acting in concerted coordination with the other Defendants and using the intermediary to facilitate their coordinated conduct.

69.    The concerted coordination is apparent from the Confirmation itself. First, the Confirmation clearly indicates that only "selected sellers" may partake in the pricing arrangement and that these "selected sellers" would be "vetted". *See* Exhibit 22 at 1, 6. Accordingly, each Defendant knew that not only would there be *other* sellers involved in the coordinated scheme, but also that a seller must be "selected" and "vetted" in order to partake in the same. *Id.*. Not every competitor in the eBay GB Market could unilaterally choose to participate in the Confirmations.

70.    Second, the Confirmation suggests on its face that the pricing arrangements were pre-planned. For example, the Confirmation indicates in the box where the terms are to be either approved the term, "PLANNED". Such "planned" activity eliminates the chance of any potential unilateral conduct in pricing and instead falls into the scope of explicitly *coordinated* action by Defendants through the intermediary.



*Figure 3*

*See* Exhibit 22 at 12 (Figure 3).

71.    Third, the seamlessness sequencing is so important in Defendants' concerted coordination that the Confirmation allows the intermediary to "start" and "end" the below-Cost pricing in the event that a Defendant fails to do so itself during the specified time period. *See* Exhibit 22 at 2.  As such, Defendants' below-Cost pricing is sequenced and orchestrated as determined by Defendants, lock-step, whether or not one Defendant itself fails to start or end the below-Cost pricing as planned.   Instead of allowing legal remedy for a Defendant's breach of the Confirmation's terms (as would be more customary), the Confirmation instead ensures that the orchestrated sequencing of sales at below-Cost pricing is kept on schedule.

72.    Fourth, the Confirmation gives control to the intermediary to set "Dynamic Pricing": to reduce the already subsidized prices further if necessary to consume the market: "In the event eBay determines in its sole discretion that a [GBC] is selling too slowly in response to market demand, then Seller authorizes eBay to reduce the Starting Deal Price".   There even exists a separate formula, based on "automated algorithms", to adjust the price of the GBC to make sure that it can beat market demand: "Seller agrees eBay may elect to use automated algorithms to implement Dynamic Pricing Adjustments." Exhibit 22 at 2-3.  There is no unilateral action here by a Defendant: in fact, once Defendants sell at the subsidy price dictated by the Confirmation, sellers are not even allowed to change the listings: "No Seller Changes . . .for the duration of the Deal." *Id.* at 2.

73.    Notably, provisions in the Confirmation insulate the intermediary from liability exposure due to conduct by Defendants: "Seller shall be solely responsible for compliance with all applicable laws . . . Seller shall be responsible for any

charges, fines or penalties that may be imposed on Seller or eBay as a result of Seller's failure to comply with applicable law related to the Deal offered by Seller on the eBay Site[.] Seller shall seek the independent advice of a qualified attorney at Seller's own expense with any questions Seller may have regarding compliance with laws or pricing claims in connection with the Deal[.]" *See* Exhibit 22 at 3-4.

74.    Moreover, every Defendant has agreed to secrecy and confidentiality with the intermediary and has agreed to hold the intermediary harmless. Exhibit 22 at 3-4.  The coordinated conduct has been kept secret from competitors other than Defendants and from customers.

75.    Importantly, each Defendant entered into this coordinated arrangement with the other Defendants in order to partake in the price-fixing scheme because each Defendant knew that the other Defendants, particularly Defendant Apmex, Inc., were involved and that participating in the agreement with the other participating Defendants would allow such Defendants access to market share and market power as competition would be foreclosed and/or rendered ineffectual.

76.    Furthermore, each Defendant also knew that Defendant Apmex, Inc. was and is an integral part of the eBay GB Market at the time they entered into Confirmations with eBay.  Defendant Apmex, Inc. enjoys a unique position with the intermediary, integrating websites and online informational manuals and investment guides. *See* Exhibit 2; *see* Exhibits 23-25; *see* Exhibit 31; *see also infra* ¶¶ 91-93.

1
2
3
4
5
6
7
8
9
10
11
12
13



*Figure 4*

14
15

*See* Exhibit 25 (Figure 4).

16

*Market Activity*

17

77.     Furthermore, market activity in the sale of GBCs in the eBay GB

18

Market demonstrates Defendants' concerted coordination. While the Confirmations

19

allow the inference of an agreement among Defendants as the selected sellers, the

20

sales numbers actually *demonstrate* the concerted coordination.  In fact, a snapshot

21

of the sales activity involving leading GBCs—Perth Mint 1 oz. gold bars, South

22

African Krugerrand 1 oz. gold coins, Canadian Maple Leaf 1 oz. gold coins, and

23

American Eagle 1 oz. gold coins—by certain Defendants from the months of June

24
25
26
27
28

SECOND AMENDED COMPLAINT

and July of 2019 (the "Sampling") is exemplary of Defendants' confirmations with eBay in concerted action.[4]

78.     For example, on or about June 19, 2019, Defendant Liberty Coin, LLC sold *exactly* 1,000 Perth Mint 1 oz. gold bars at a below-Cost price.[5]  On that same date, however, not a single one of the other eight (8) of the Defendants in the Sampling (Bullion Exchange, LLC, Texas Gold and Silver Exchange, Ltd., SD Bullion, Inc., Apmex, Inc., DBS Coins, L.P., Scottsdale Mint, L.L.L.P., JM Bullion, Inc., Pinehurst Coin Exchange, Inc.) sold *even one* Perth Mint 1 oz. gold bar. Moreover, and despite selling 1,000 Perth Mint 1 oz. gold bars in a single day, Defendant Liberty Coin, LLC sold only two (2) Perth Mint 1 oz. gold bars *in total* in the remaining month of June 2019.

79.     In another example, on or about June 5 and 6, 2019, Bullion Exchange, LLC sold 880 and 120 (another exact 1,000) South African Krugerrand 1 oz. gold coins, respectively, at a below-Cost price.[6]  On those same dates, however, four of

[4] The Sampling consists of a snapshot of the sales activity for leading GBCs by Defendants in the eBay GB Market over the two months of June and July 2019. According to eBay and/or Defendant Apmex, Inc.'s public online sources, these particular GBCs are either the most popular, most recognizable, have the highest purity, and/or are in highest demand. *See* Exhibit 2 at 8; Exhibit 3 at 2, 23; Exhibit 5 at 2, 4.

[5] Defendant Liberty Coin, LLC sold these 1000 gold bars at a price of $1353-1362 when the spot price of gold was $1344.05.  Taking into account the Costs, as defined herein, Defendant Liberty Coin, LLC sold these 1000 gold bars below-Cost. *See supra* ¶ 40(a-t).

[6] Defendant Bullion Exchange, LLC sold these 880 gold coins at a price of $1346 when the spot price of gold was $1335.05.  Taking into account the Costs, as defined herein, Defendant Bullion Exchange, LLC sold the 880 gold coins at below-Cost. *See supra* ¶ 40(e).  Defendant Bullion Exchange, Inc. sold the 120 gold coins at a price of $1352 each.  Defendant's Cost in each gold coin was approximately: (i) $1335.50 in purchase cost; (ii) $81.12 in eBay transaction fees; (iii) $6.76 in shipping fees; and

the Defendants (SD Bullion, Inc., Apmex, Inc., JM Bullion, Inc., Bay Precious Metals, Inc.) did not sell a single South African Krugerrand 1 oz. gold coins. Despite selling *exactly* 1,000 South African Krugerrand 1 oz. gold coins over two days, Defendant Bullion Exchange, LLC sold only a total of four (4) South African Krugerrand 1 oz. gold coins in the remaining month of June 2019 and only three (3) South African Krugerrand 1 oz. gold coins *in the entire month* of July 2019.

80.     Moreover, on or about July 11, 2019, Defendant JM Bullion, Inc. sold 700 Canadian Maple Leaf 1 oz. gold coins at a below-Cost rate.[7]   On that same date, however, not a single one of the other eight Defendants sampled (Bullion Exchange, LLC, SD Bullion, Inc., Liberty Coin, LLC, Apmex, Inc., DBS Coins, L.P., Pinehurst Coin Exchange, Inc., Silver Gold Bull USA, Inc., *Moderncoinmart, LLC.*) sold a single Canadian Maple Leaf 1 oz. gold coins.  Moreover, and despite selling 700 Canadian Maple Leaf 1 oz. gold coins in a single day, Defendant JM Bullion, Inc. sold only a total of fourteen (14) Canadian Maple Leaf 1 oz. gold coins in the remaining month of July 2019.

81.     On or about July 17, 2019, Defendant Apmex, Inc. sold 500 American Eagle 1 oz. gold coins at a below-Cost rate.[8]   On that same date, however, 7 other

---

(iv) $39.21 in payment processing fees.  Accordingly, and without even taking into consideration overhead costs, Defendant Bullion Exchange, Inc. sold such gold coins on such date at $110.59 below its Cost per gold coin.

[7] Defendant JM Bullion, Inc. sold these 700 coins at a price of $1421 when the spot price of gold was $1413.75.   Taking into account the Costs, as defined herein, Defendant JM Bullion, Inc. sold these 700 gold coins below-Cost. *See supra* ¶ 40(i).

[8] Defendant Apmex, Inc. sold the 500 gold coins at a price of $1435 each. Defendant's Cost in each gold coin was approximately: (i) $1410.35 in purchase cost; (ii) $86.10 in eBay transaction fees; (iii) $7.18 in shipping fees; and (iv) $41.62 in payment processing fees.  Accordingly, and without even taking into consideration

- 30 -

Defendants (Bullion Exchange, LLC, Texas Gold and Silver Exchange, Ltd., SD Bullion, Inc., JM Bullion, Inc., Pinehurst Coin Exchange, Inc., Silver Gold Bull USA, Inc., Bay Precious Metals, Inc.) sold *zero* American Eagle 1 oz. gold coins and only one Defendant (Liberty Coin, LLC.) sold *one single* American Eagle 1 oz. gold coin.  Despite selling 500 American Eagle 1 oz. gold coins in a single day, Defendant Apmex, Inc. sold only 13 American Eagle 1 oz. gold coins on July 18, 2019 and *absolutely no* American Eagle 1 oz. gold coins *in all of* June 2019.

82.    In fact, the chart below illustrates the sales in the sampling visually, reflecting sales distribution of the Sampling:



*Figure 5*

overhead costs, Defendant Bullion Exchange, Inc. sold such gold coins on such date at $110.24 below its Cost per gold coin.

*See* Exhibit 12 for larger image (Figure 5); *see also* Exhibit 13 for data in tabular form.  At and above the 100-item level, the sales are marked by sequencing and spiking (a sale at a high level and then back down to zero or negligible sales). In particular, this sequencing and spiking at the 100-item level, the 250-item level, the 300-item level, the 500-item level and the 600-item level, even over the sampled 8-week period.

83.     Such a price sequencing demonstrates concerted coordination and unity of purpose.  The distribution of sales as evidenced in the Sample Period even demonstrates an orchestrated sequencing of sales of the sampled leading GBCs at predetermined levels.

E.     Market Power and Antitrust Injury

84.     As anticipated by Defendants, and as a direct result of their anticompetitive acts, Defendants have been able, and continue, to consolidate market power and foreclose competition in the eBay GB Market.

85.     Defendants today have obtained, and currently possess, impregnable market power within the eBay GB Market.

86.     For example, in 2008, there were over approximately 1000 sellers in each the eBay GB Market, including dealers and private individual sellers.

87.     In the first year of the Time Period alone, the number of sellers in the eBay GB Market had dropped to approximately 350.

88.     By the end of the Time Period, the number of sellers in these respective markets had diminished further to approximately 200, representing a 75% decrease in the number of sellers in the Time Period alone.  Other than Defendants, however, the overwhelming majority of sellers who currently remain in

the eBay GB Market, like Plaintiff, are effectively "locked out": they may *list* GBCs in the eBay GB Market but are unable to *sell* GBCs in the eBay GB Market because of Defendants' coordinated anticompetitive conduct. Defendants' coordinated scheme leaves the remaining sellers effectively "locked out" of the eBay GB Market.

89.   In other words, while the remaining sellers technically are "in" the eBay GB Market (in that they maintain a digital presence), they do not effectively participate in the market since they are unable to actually sell products in a manner to render them actual competitors.

90.   Plaintiff estimates that, today, Defendants together control approximately 95% of the sales of GBCs in the eBay GB Market and that Defendant Apmex, Inc. alone controls more than 50% of the sales of GBCs in the Market.[9]

91.   In fact, Defendant Apmex, Inc. enjoys a curiously integrated presence on the eBay platform in the form of the Bullion Education Center (each page of the center states "information provided by Apmex"), which provides information and guidance to novices in gold buying and investing. *See* Exhibits 2, 23-25; and 31. Only Defendant Apmex's "Quick Start Guide to Investing in Precious Metals" is featured on eBay's website. Exhibit 23 at 2; *see* Exhibit 2.  Research even indicates

---

[9] Since actual specific figures involving the number of sellers in the respective markets and sales details are in the possession of eBay and/or Defendants, and are not publicly available, Plaintiff must rely on its own estimations based on its participation in the respective markets since 2006.  Plaintiff has issued a subpoena to eBay seeking *inter alia* the total sales of GBCs in the eBay GB Market during the Time Period as well as information on sales of GBCs by Defendants during this same time period. *See* Exhibit 15.

that real concerns regarding the impact on competition for dealers of precious metals even prompted statements by eBay and Defendant Apmex, Inc. in an effort to assuage the fears of other sellers.

92.     In discussing the gold bullion market on eBay, eBay has stated, "We are very excited about the relationship that we have with Apmex.  Like I said, the scale that they are able to deliver just really gives us a great deal of confidence in that customer experience.[10].  And we're gonna use the marketing around the Apmex and the Apmex Bullion center on eBay as a way to increase buyer awareness of eBay as a bullion destination[.]" *Id.*

93.     Defendant Apmex, Inc. in turn has stated "We look at this as an extraordinary opportunity to grow not only eBay's customer base, but also Apmex's as well.[11]   And in the process we're gonna make a better place for the entire industry." *Id*.  Defendant Apmex Inc.'s integrated relationship with eBay in the eBay GB Market required public announcements to dissuade sellers of the notion that Defendant Apmex, Inc. would assume significant market power and destroy competition in the eBay GB Market.

94.     Furthermore, certain characteristics unique to the eBay GBC Market, such as a seller rating and/or ranking system based on *inter alia* a history of the seller's sales and the ability of the Defendants to maintain below-Cost pricing for extended periods of time as described above, create real barriers to entry. *See*

---

[10] Coinweek, APMEX and eBay Announce Precious Metals Trading. VIDEO: 3:27 (Oct. 23, 2012),  https://www.youtube.com/watch?v=8_ps0ib2fHY.

[11]  Coinweek, APMEX and eBay Announce Precious Metals Trading. VIDEO: 3:27 (Oct. 23, 2012),  https://www.youtube.com/watch?v=8_ps0ib2fHY.

Exhibit 37.  New sellers are unlikely to be able to compete with Defendants, even after joining the eBay GBC Market, because it takes a significant amount of time for a new seller to obtain a selling history allowing it to rise in the rating and/or ranking system. *See id*.

95.     eBay's rules actually explain the manner in which a seller may become a "Top Rated Seller".  According to eBay, among other things, a seller must "[h]ave at least 100 transactions and $1,000 in sales with US buyers over the past 12 months" in order to qualify. *See* Exhibit 37 at 2.  Otherwise a seller falls into either an "Above Average" or "Below Average" category. *Id*. at 1-2.

96.     By eliminating and rendering ineffective existing and long-time sellers, Defendants are not only foreclosing competition, but they are eliminating sellers with superior seller rankings and thereby ensuring that competition remains foreclosed into the foreseeable future.  This is because any new sellers joining the eBay GB Market would be joining at the bottom of the seller rankings, thereby guaranteeing that Defendants' market power remains impregnable for the foreseeable future, even should they cease their below-Cost pricing.

F.     Reasonable Prospect of Recoupment

97.     Due to Defendants' coordinated anti-competitive conduct during the Time Period, there has been both a material reduction in the number of competitors in each of the Market coupled by a tectonic consolidation of market share in sales of GBCs in the eBay GB Market.  Defendants today control 95% of sales in the Market.

98.     Defendants have a reasonable prospect of recoupment their investment in below-Cost prices.

99.    First, Defendants receive a hidden "kickback" on the eBay transaction fee (a fee all sellers must incur which, for the highest-tiered sellers, is the lowest rate of 6.15%) to sell a predetermined amount of GBCs at the pre-determined below-Cost price for a predetermined amount of time. *See* Exhibit 22 at 1, 5-6, 8-10, 12; *see also* Exhibit 8.   This "kickback" has cushioned, and continues to cushion, the scale of losses incurred by Defendants in the below-Cost pricing.  As a result, it has also assisted, and continues to assist, Defendants in sustaining their below-Cost pricing scheme for the Time Period while eliminating competition and securing market consolidation in the eBay GB Market.

100.   This kickback is evidenced directly on the Confirmation:



| Current non-discounted site price | Initial Deal Proposed | Seller Discount | Subsidy | Starting Deal Price |
|---|---|---|---|---|
| $100 | $90 | $10 | $10 | $80 |

| Current non-discounted site price | Reduced Deal Proposed | Seller Discount | Subsidy | Reduced Deal Price |
|---|---|---|---|---|
| $100 | $85 | $15 | $15 | $70 |

*Figure 6*

*See* Exhibit 22 at 3 (Figure 6).  In addition, the kickback is also evidenced on the "Subsidized Deal Terms" schedule:

Schedule 1

Subsidized Deal Terms

These Subsidized Deal Terms shall govern the Deal to be offered on the eBay Site as described herein. Upon acceptance (confirmation of acceptance via email transmission from Seller or through an online Deal submission portal is sufficient), these terms shall be incorporated by reference into the Daily Deals Agreement between eBay Inc. and Seller.

| | | Initial* | Maximum |
|---|---|---|---|
| Seller Name | | | |
| eBay Site | www.ebay.com | | |
| Deal Start Date/Time and Price Drop Time | | | |
| Deal Stop Date/Time and Price Change Time | | | |
| Specified Item and Description | | | |
| List Price | | | |
| Proposed Deal Price (after Seller Discount and Subsidy Payment) | | | |
| Seller Discount | | | |
| Subsidy Payment per unit | | | |
| Maximum Subsidized Quantity | | | |
| Quantity Limitation (Per Purchaser) | | | |
| Approve/Decline | | | |

*Could be modified for Dynamic Pricing per section 5.2(iii) in the Agreement.

Notes:

*Figure 7*

*See* Exhibit 22 at 8 (Figure 7).

101.   Second, Defendants' below-Cost pricing scheme is not sustainable indefinitely, particularly in the event that the "kickbacks" are ended.  As it stands, the "kickbacks" are periodic and not permanent. *See* Exhibit 22 at 5-6, 8-10, 12. The Confirmations are scheduled in periodic intervals. *Id.*   Given the complete market power secured by Defendants, the significant rate at which competing sellers like Plaintiff are foreclosed or effectively "locked out" of the eBay GB Market, and the coordinated methods used by Defendants in pricing during the Time Period, Defendants have a reasonable prospect of recouping their investment in below-Cost pricing through supracompetitive pricing.

102.   The eBay GB Market stands ripe for supracompetitive pricing. Defendants' unchallenged market power, their near-complete foreclosure of any

- 37 -

competition and the barriers to entry for new (unranked) sellers will allow Defendants to impose supracompetitive prices on GBCs when they decide to do so and/or when the "kickbacks" assistance ends—and they will be able to do so at will.

103.   Accordingly, there is a reasonable prospect that the predatory pricing scheme imposed by Defendants will cause a rise in prices above a competitive level that would be sufficient to compensate Defendants on the predation—particularly since the predatory pricing already has been cushioned by kickbacks.

V.     CLAIMS FOR RELIEF

COUNT 1

VIOLATION OF THE ROBINSON-PATMAN ACT, 15 U.S.C.A. § 13(a)

*Plaintiff v. Defendant Apmex, Inc.*[12]

---

104.   Plaintiff realleges and incorporates paragraphs 1 through 103 of this Second Amended Complaint as if set forth fully herein.

105.   Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, provides in relevant part that "[i]t shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States . . . and where the effect of such discrimination may be

---

[12] While Plaintiff asserts a claim for Violation of The Robinson-Patman Act, 15 U.S.C.A. § 13(a) against Defendant Apmex Inc., Plaintiff reserves its right, under the Federal Rules of Civil Procedure, to seek leave to add a claim under section 13 against other defendants before trial, for good cause.

substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them[.]" 15 U.S.C. § 13(a).

106. During the Time Period, Defendants were engaged in interstate commerce in the United States involving the sale of GBCs.

107. GBCs are commodities.

108. During the Time Period, and at predetermined sustained periods of time, Defendant Apmex, Inc. offered for sale, and sold, GBCs at a below-Cost price in the eBay GB Market.

109. At the same time that Defendant Apmex, Inc. was selling the GBCs at the below-Cost price in the eBay GB Market, Defendant Apmex, Inc. also was selling GBCs, of like grade and quality, on its own website or other websites, at a different price.

110. In fact, during the Time Period, Defendant Apmex, Inc. completed a sale of a GBC at a below-Cost price, across state lines, while contemporaneously completing a sale of a GBC of like grade and quality on its own website, or other websites, at a different price.

111. On June 29, 2020, Defendant Apmex, Inc. sold one 2020 Australia $100 1 oz Gold Beneath the Southern Sky BU gold coin at a price of 1945.11 to a buyer in the State of California in the eBay GB Market. *See* Exhibit 27. Within moments of such sale, Defendant Apmex, Inc. also sold one 2020 Australia $100 1 oz Gold Beneath the Southern Sky BU gold coin at a price of 1960.93 to a buyer in the State of California on its own website. *See* Exhibit 28.

112.   Defendant Apmex Inc. has been selling GBCs at below-Cost prices as part of their scheme to obtain greater market share in the sale of GBCs in the eBay GB Market and to secure market power and control the sale of GBCs in the eBay GB Market.

113.   Defendant Apmex, Inc. also had a reasonable prospect of recouping its investment in selling such GBCs at the below-Cost price and there is a reasonable likelihood that the predatory pricing scheme imposed by Defendant Apmex, Inc. will cause a rise in prices above a competitive level.

114.   Defendant Apmex, Inc.'s anti-competitive scheme caused, and continues to cause, injury to competition and to competitors, including Plaintiff, in the eBay GB Market and has decimated competitors within the eBay GB Market so that Defendant Apmex, Inc. today effectively controls more than 50% of all sales of GBCs in the eBay GB Market.

115.   As a result of Defendant Apmex, Inc.'s unchallenged market power and its market share, there exist substantial barriers to entry into the eBay GB Market and competitors, including Plaintiff, lack the capacity to expand their output.

116.   Defendant Apmex, Inc.'s anti-competitive scheme constitutes discriminatory, differential pricing that violates Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. 13(a).

*Prayer for Relief—Count 1*

Wherefore, Plaintiff A-WORLD TRADE, INC. respectfully requests that this Honorable Court award Plaintiff judgment in its favor and against Defendant

APMEX, INC. for (a) compensatory damages in an amount to be proven at trial; (b) treble damages pursuant to 15 U.S.C. § 15; (c) attorneys' fees in an amount to be proven at trial pursuant to 15 U.S.C. § 15; (d) costs of suit pursuant to 15 U.S.C. § 15; and (e) any and all other relief which this Honorable Court finds just and proper.

COUNT 2

VIOLATION OF THE SHERMAN ANTITRUST ACT, 15 U.S.C.A. § 1

*Plaintiff v. All Defendants*

117.   Plaintiff realleges and incorporates paragraphs 1 through 103 of this Second Amended Complaint as if set forth fully herein.

118.   Section 1 of the Sherman Antitrust Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C.A. § 1.

119.   Defendants have engaged in unlawful conduct when selling GBCs across state lines in interstate commerce in that Defendants knowingly coordinated and agreed to sequence the pricing of GBCs at below their Cost, in order to foreclose competition in the eBay GB Market. *See supra* ¶¶ 60-61, 65-67, 69, 71. Defendants did so through an intermediary, receiving kickbacks, and have a reasonable prospect of recouping their investment, and there is a reasonable likelihood that the predatory pricing scheme will cause a rise in prices above a competitive level. *See supra* ¶¶ 61, 65, 99, 101.

120.   Defendants' anti-competitive scheme caused, and continues to cause, injury to competition in the eBay GB Market, has decimated competitors within the

eBay GB Market, and has allowed Defendants today to effectively hold market power in the form of approximately 95% of all sales of GBCs in the eBay GB Market. *See supra* ¶¶ 84-90.

121.   Defendants' conduct has restrained trade by foreclosing competition in the eBay GB Market through anticompetitive and conspiratorial agreements and has also caused, and continues to cause, injury to competition and to competitors, including Plaintiff.  *See supra* ¶¶ 84-96.

122.   Defendants' conduct and anti-competitive scheme constitutes an unlawful restraint of trade under Section 1 of the Sherman Antitrust Act, 15 U.S.C.A. § 1, and is of the type that the antitrust laws were intended to prevent.

*Prayer for Relief—Count 2*

Wherefore, Plaintiff A-WORLD TRADE, INC. respectfully requests that this Honorable Court award Plaintiff judgment in its favor and against Defendants APMEX, INC.; BAY PRECIOUS METALS, INC.; BULLION EXCHANGE, LLC; BULLION SHARK, LLC; DBS COINS LP; JM BULLION, INC.; LIBERTY COIN, LLC; MODERNCOINMART, LLC; PINEHURST COIN EXCHANGE, INC.; SCOTTSDALE MINT, LLLP; SD BULLION, INC.; SILVER GOLD BULL USA, INC.; SILVER TOWNE, INC.; and TEXAS GOLD AND SILVER EXCHANGE, LTD., jointly and severally, for (a) compensatory damages in an amount to be proven at trial; (b) treble damages pursuant to 15 U.S.C. § 15; (c) attorneys' fees in an amount to be proven at trial pursuant to 15 U.S.C. § 15; (d) costs of suit pursuant to 15 U.S.C. § 15; and (e) any and all other relief which this Honorable Court finds just and proper.

COUNT 3

VIOLATION OF CAL. BUS. & PROFS. CODE §17043

(Purpose to Injure Competition)

*Plaintiff*

*v.*

*Apmex, Inc.; Bay Precious Metals, Inc.; Bullion Exchange, LLC; Bullion Shark, LLC; JM Bullion, Inc.; Moderncoinmart, LLC; Pinehurst Coin Exchange, Inc.; Scottsdale Mint, LLLP; SD Bullion, Inc.; Silver Gold Bull USA, Inc.; Silver Towne, Inc.; and Texas Gold And Silver Exchange, LTD.*

123.   Plaintiff realleges and incorporates paragraphs 1 through 103 of this Second Amended Complaint as if set forth fully herein.

124.   California Business & Professions Code section 17043 prohibits "sell[ing] any article or product at less than the cost thereof to [a] vendor . . . for the purpose of injuring competitors or destroying competition."

125.   Defendants each offered GBCs for sale in the eBay GB Market and eBay GC Market without excluding sales to consumers in California.

126.   By using the eBay platform and listing GBCs in the eBay GB Market, Defendants indeed marketed GBCs for sale to consumers in California.

127.   During the Time Period, each Defendant sold GBCs at prices below its Cost.  By way of example, Plaintiff specifically incorporates herein its allegations contained in paragraph 40 and subparagraphs 40(a)-(t) as if fully stated herein.

128.   One or more of each Defendant's sales of GBCs involved a sale in California. *See* Exhibit 7 at 2.

129.   Defendants' purpose in selling GBCs below their Cost, during the Time Period, was to consolidate market power and foreclose competition in the eBay GB Market.

130.   In making such sales at the below-Cost prices, Defendants sought to obtain greater market share in the sale of GBCs in the eBay GB Market to obtain market power and control the sale of GBCs in the eBay GB Market.

131.   In making such sales at the below-Cost prices, Defendants sought to eliminate competition in the eBay GB Market and to injure their competitors in such markets.

132.   Today, Defendants together control approximately 95% of the sales of GBCs in the eBay GB Market and approximately 95% of the sales of eBay GB Market.

133.   Moreover, the overwhelming majority of sellers other than Defendants who currently remain in the eBay GB Market, like Plaintiff, may *list* GBCs in the eBay GB Market but are unable to *sell* them in the eBay GB Market because of Defendants' coordinated anticompetitive conduct.   The remaining sellers are effectively "locked out" of the eBay GB Market.

134.   Plaintiff offered for sale, sought to sell and/or tried to sell GBCs in the eBay GB Market during the Time Period; however, Defendants' conduct took sales of GBCs away from competitors, including Plaintiff, in the eBay GB Market.

135.   As a direct and proximate cause of Defendants' below-Cost pricing in the eBay GB Market, Plaintiff and other competitors have been injured.

136.   Plaintiff has suffered, and continues to suffer, injury and losses as a direct result of Defendants' unfair business practices as described herein.

*Prayer for Relief—Count 3*

Wherefore, Plaintiff A-WORLD TRADE, INC. respectfully requests that this Honorable Court award Plaintiff relief in its favor and against Defendants APMEX, INC.; BAY PRECIOUS METALS, INC.; BULLION EXCHANGE, LLC; BULLION SHARK, LLC; JM BULLION, INC.; MODERNCOINMART, LLC; PINEHURST COIN EXCHANGE, INC.; SCOTTSDALE MINT, LLLP; SD BULLION, INC.; SILVER GOLD BULL USA, INC.; SILVER TOWNE, INC.; and TEXAS GOLD AND SILVER EXCHANGE, LTD., jointly and severally, for (a) compensatory damages in an amount to be proven at trial; (b) treble damages pursuant to Cal. Bus. & Prof. § 17082; (c) attorneys' fees in an amount to be proven at trial pursuant to Cal. Bus. & Prof. § 17082; (d) costs of suit pursuant to Cal. Bus. & Prof. § 17082; and (e) any and all other relief which this Honorable Court finds just and proper.

## COUNT 4

### VIOLATION OF CAL. BUS. & PROFS. CODE §17043

(Purpose to Injure Competition)

*Plaintiff v. Liberty Coin, LLC and DBS Coins LP*

137. Plaintiff realleges and incorporates paragraphs 1 through 103 of this Second Amended Complaint as if set forth fully herein.

138. California Business & Professions Code section 17043 prohibits "sell[ing] any article or product at less than the cost thereof to [a] vendor . . . for the purpose of injuring competitors or destroying competition."

139.   Defendants Liberty Coin, LLC and DBS Coins LP are headquartered in California and as such, are subject to the jurisdiction of the California Business & Professions Code section 17043.

140.   Defendants each offered GBCs for sale in the eBay GB Market without excluding sales to consumers in California.

141.   By using the eBay platform and listing GBCs in the eBay GB Market, Defendants indeed marketed GBCs for sale to consumers in California.

142.   Defendants Liberty Coin, LLC and DBS Coins LP are headquartered in California and as such, are also subject to the jurisdiction of the California Business & Professions Code section 17043 on this basis.

143.   During the Time Period, each Defendant sold GBCs at prices below its Cost.  By way of example, Plaintiff specifically incorporates herein its allegations contained in paragraph 40 and subparagraphs 40(a)-(t) as if fully stated herein.

144.   One or more of each Defendant's sales of GBCs involved a sale in California. *See* Exhibit 7 at 2.

145.   Defendants' purpose in selling GBCs below their Cost, during the Time Period, was to consolidate market power and foreclose competition in the eBay GB Market.

146.   In making such sales at the below-Cost prices, Defendants sought to obtain greater market share in the sale of GBCs in the eBay GB Market, respectively, to obtain market power and control the sale of GBCs in the eBay GB Market.

147.   In making such sales at the below-Cost prices, Defendants sought to eliminate competition in the eBay GB Market and to injure their competitors in such markets.

148.   Today, Defendants together control approximately 95% of the sales of GBCs in the eBay GB Market.

149.   Moreover, the overwhelming majority of sellers other than Defendants who currently remain in the eBay GB Market, like Plaintiff, may *list* GBCs in the eBay GB Market but are unable to *sell* them in the eBay GB Market because of Defendants' coordinated anticompetitive conduct.   The remaining sellers are effectively "locked out" of the eBay GB Market.

150.   Plaintiff offered for sale, sought to sell and/or tried to sell GBCs in the eBay GB Market during the Time Period; however, Defendants' conduct took sales of GBCs away from competitors, including Plaintiff, in the eBay GB Market.

151.   As a direct and proximate cause of Defendants' below-Cost pricing in the eBay GB Market, Plaintiff and other competitors have been injured.

152.   Plaintiff has suffered, and continues to suffer, injury and losses as a direct result of Defendants' unfair business practices as described herein.

*Prayer for Relief—Count 4*

Wherefore, Plaintiff A-WORLD TRADE, INC. respectfully requests that this Honorable Court award Plaintiff relief in its favor and against Defendants LIBERTY COIN, LLC and DBS COINS LP, jointly and severally, for (a) compensatory damages in an amount to be proven at trial; (b) treble damages pursuant to Cal. Bus. & Prof. § 17082; (c) attorneys' fees in an amount to be proven

at trial pursuant to Cal. Bus. & Prof. § 17082; (d) costs of suit pursuant to Cal. Bus. & Prof. § 17082; and (e) any and all other relief which this Honorable Court finds just and proper.

COUNT 5

VIOLATION OF CAL. BUS. & PROFS. CODE §17045

(Secret Payments or Allowances)

*Plaintiff*

*v.*

*Apmex, Inc.; Bay Precious Metals, Inc.; Bullion Exchange, LLC; Bullion Shark, LLC; JM Bullion, Inc.; Moderncoinmart, LLC; Pinehurst Coin Exchange, Inc.; Scottsdale Mint, LLLP; SD Bullion, Inc.; Silver Gold Bull USA, Inc.; Silver Towne, Inc.; and Texas Gold And Silver Exchange, LTD.*

153.   Plaintiff realleges and incorporates paragraphs 1 through 103 of this Second Amended Complaint as if set forth fully herein.

154.   California Business & Professions Code section 17045 states that "[t]he secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise . . . to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful."

155.   By using the eBay platform and listing GBCs in the respective eBay GB Market, and without excluding sales to consumers in California, Defendants indeed marketed GBCs for sale to consumers in California.

156.   During the Time Period, Defendants each received secret payments—"kickbacks" of the eBay transaction fee—for the sale of GBCs in the eBay GB Market. *See supra* ¶¶ 98-100.

157.   During the Time Period, each Defendant received a "kickback" of all or some of the eBay transaction fee for its sales of GBCs at prices below its Cost.

158.   One or more of each Defendant's sales of GBCs for which Defendant received and accepted a "kickback" of the eBay transaction fee involved a sale in California. *See* Exhibit 7 at 2.

159.   These "kickbacks" of the eBay transaction fee allowed Defendants to continue and prolong their below-Cost pricing during the Time Period and thereby consolidate market power and foreclose competition in the eBay GB Market.

160.   These "kickbacks" of the eBay transaction fee allowed Defendants to continue and prolong their below-Cost pricing during the Time Period and allowed Defendants to obtain greater market share in the sale of GBCs  in the eBay GB Market, to control the sale of GBCs in the eBay GB Market, and to eliminate competition in the eBay GB Market.  These "kickbacks" also allowed Defendants to injure their competitors in such markets.

161.   Today, Defendants together control approximately 95% of the sales of GBCs in the eBay GB Market.

162.   Moreover, the overwhelming majority of sellers other than Defendants who currently remain, respectively, in the eBay GB Market, like Plaintiff, may *list*

GBCs in the eBay GB Market but are unable to *sell* them in such markets because of Defendants' coordinated anticompetitive conduct.   The remaining sellers are effectively "locked out" of the eBay GB Market.

163.   Plaintiff offered for sale, sought to sell and/or tried to sell GBCs in the eBay GB Market during the Time Period; however, Defendants' conduct took sales of GBCs away from competitors, including Plaintiff, in the eBay GB Market.

164.   As a direct and proximate cause of Defendants' below-Cost pricing in the eBay GB Market, Plaintiff and other competitors have been injured.

165.   Plaintiff has suffered, and continues to suffer, injury and losses as a direct result of Defendants' unfair business practices as described herein.

*Prayer for Relief—Count 5*

Wherefore, Plaintiff A-WORLD TRADE, INC. respectfully requests that this Honorable Court award Plaintiff relief in its favor and against Defendants APMEX, INC.; BAY PRECIOUS METALS, INC.; BULLION EXCHANGE, LLC; BULLION SHARK, LLC; JM BULLION, INC.; MODERNCOINMART, LLC; PINEHURST COIN EXCHANGE, INC.; SCOTTSDALE MINT, LLLP; SD BULLION, INC.; SILVER GOLD BULL USA, INC.; SILVER TOWNE, INC.; and TEXAS GOLD AND SILVER EXCHANGE, LTD., jointly and severally, for (a) compensatory damages in an amount to be proven at trial; (b) treble damages pursuant to Cal. Bus. & Prof. § 17082; (c) attorneys' fees in an amount to be proven at trial pursuant to Cal. Bus. & Prof. § 17082; (d) costs of suit pursuant to Cal. Bus. & Prof. § 17082; and (e) any and all other relief which this Honorable Court finds just and proper.

COUNT 6

VIOLATION OF CAL. BUS. & PROFS. CODE §17045

(Secret Payments or Allowances)

*Plaintiff v. Liberty Coin, LLC and DBS Coins LP*

---

166.   Plaintiff realleges and incorporates paragraphs 1 through 103 of this Second Amended Complaint as if set forth fully herein.

167.   California Business & Professions Code section 17045 states that "[t]he secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise . . . to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful."

168.   Defendants Liberty Coin, LLC and DBS Coins LP are headquartered in California and as such, are also subject to the jurisdiction of the California Business & Professions Code section 17045 on this basis.

169.   By using the eBay platform and listing GBCs in the respective eBay GB Market, and without excluding sales to consumers in California, Defendants indeed marketed GBCs for sale to consumers in California.

170.   During the Time Period, Defendants each received secret payments—"kickbacks" of the eBay transaction fee—for the sale of GBCs in the eBay GB Market.

171.   During the Time Period, each Defendant received a "kickback" of all or some of the eBay transaction fee for its sales of GBCs at prices below its Cost.

172.   One or more of each Defendant's sales of GBCs for which Defendant received and accepted a "kickback" of the eBay transaction fee involved a sale in California. *See* Exhibit 7 at 2.

173.   These "kickbacks" of the eBay transaction fee allowed Defendants to continue and prolong their below-Cost pricing during the Time Period and thereby consolidate market power and foreclose competition in the eBay GB Market.

174.   These "kickbacks" of the eBay transaction fee allowed Defendants to continue and prolong their below-Cost pricing during the Time Period and allowed Defendants to obtain greater market share in the sale of GBCs in the eBay GB Market, respectively, to control the sale of GBCs in the eBay GB Market, and to eliminate competition in the eBay GB Market.  These "kickbacks" also allowed Defendants to injure their competitors in such markets.

175.   Today, Defendants together control approximately 95% of the sales of GBCs in the eBay GB Market.

176.   Moreover, the overwhelming majority of sellers other than Defendants who currently remain, respectively, in the eBay GB Market, like Plaintiff, may *list* GBCs in the eBay GB Market but are unable to *sell* them in such markets because of Defendants' coordinated anticompetitive conduct.   The remaining sellers are effectively "locked out" of the eBay GB Market.

177.   Plaintiff offered for sale, sought to sell and/or tried to sell GBCs in the eBay B Market during the Time Period; however, Defendants' conduct took sales of GBCs away from competitors, including Plaintiff, in the eBay GB Market.

178.   As a direct and proximate cause of Defendants' below-Cost pricing in the eBay GB Market, Plaintiff and other competitors have been injured.

SECOND AMENDED COMPLAINT

179.   Plaintiff has suffered, and continues to suffer, injury and losses as a direct result of Defendants' unfair business practices as described herein.

*Prayer for Relief—Count 6*

Wherefore, Plaintiff A-WORLD TRADE, INC. respectfully requests that this Honorable Court award Plaintiff relief in its favor and against Defendants LIBERTY COIN, LLC and DBS COINS LP, jointly and severally, for (a) compensatory damages in an amount to be proven at trial; (b) treble damages pursuant to Cal. Bus. & Prof. § 17082; (c) attorneys' fees in an amount to be proven at trial pursuant to Cal. Bus. & Prof. § 17082; (d) costs of suit pursuant to Cal. Bus. & Prof. § 17082; and (e) any and all other relief which this Honorable Court finds just and proper.

DATED: July 20, 2020                    Respectfully Submitted,

                                        A-WORLD TRADE INC.

                                        */s/ Gayane Khechoomian*

                                        Gayane Khechoomian
                                        (SBN 296673)
                                        201 N. Brand Blvd., Suite 200
                                        Glendale, California 92203-3590
                                        Telephone: (818) 454-0446
                                        Email: gayane.khechoomian@gmail.com

                                        KARNIG KERKONIAN (pro hac vice)
                                        Elizabeth Al-Dajani (pro hac vice)
                                        KERKONIAN DAJANI LLC
                                        1555 Sherman Avenue, Suite 344
                                        Evanston, Illinois 60201
                                        Telephone: (312) 416-6180

Facsimile: (312) 604-7815
Email: kkerkonian@kerkoniandajani.com
Email: ealdajani@kerkoniandajani.com

GARO B. GHAZARIAN
(SBN 152790)
Law Office of Garo B. Ghazarian
15915 Ventura Blvd., Suite 203
Encino, California 91436
Telephone: (818) 905-6484
Email: gbglaw@sbcglobal.net

*Attorneys for Plaintiff*

SECOND AMENDED COMPLAINT